800 So.2d 886 (2000)
STATE of Louisiana
v.
Brandon JOHNSON.
No. 99 KA 2114.
Court of Appeal of Louisiana, First Circuit.
December 18, 2000.
Writ Denied December 7, 2001.
Doug Moreau, District Attorney, Kurt Wall, Tony Clayton, Assistant District Attorneys, Baton Rouge, for Appellee State of Louisiana.
Ossie Brown, Dana Brown, Baton Rouge, Phyllis E. Mann, Alexandria, for Defendant/Appellant Brandon Johnson.
Before: FOIL, WHIPPLE, and GUIDRY, JJ.
GUIDRY, Judge.
Defendant, Brandon Johnson, was charged by grand jury indictment with first degree murder, a violation of La. R.S. *887 14:30. After a 15-day jury trial, a unanimous jury found that he was guilty of second degree murder [La. R.S. 14:30.1]. The trial court denied his motion for postverdict judgment of acquittal and motion for new trial, and defendant was sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence. Defendant now appeals, urging that the evidence was insufficient to establish beyond a reasonable doubt that he was the perpetrator of the crime.

FACTS
A parade was held in Baton Rouge, Louisiana, on Martin Luther King, Jr. Day, January 19, 1998, in which the combined marching bands of four local high schools participated. The band members gathered at Baton Rouge High School to attend a program in honor of Dr. Martin Luther King, Jr., before lining up for the parade. The parade proceeded west on Government Street in the two right lanes of the four-lane road. The band was organized by instrument sections, with the drums followed by the clarinets marching as the last two sections of the band. Marching last in the parade, behind the band, were the Capital High School Pepsters.
Brandon Johnson (the defendant), August Vallery, Dwayne Dunn and Jermaine Johnson, arrived together and attended the program at Baton Rouge High School. During the parade, these individuals, along with others, walked alongside or behind the band to keep parade watchers from walking between the rows or otherwise interfering with the band. Defendant and August Vallery both wore orange shirts that day; defendant's shirt was a plain orange Tommy Hilfiger shirt and the shirt worn by August Vallery was an orange FUBU shirt with white lettering.
During the parade, a fist fight occurred on the north side of Government Street near its intersection with 16th Street. The last few rows of the clarinet section were passing this location at that time. At some point during this fight, a gun was fired. J.B. Carter was fatally struck with five bullets. Three other individuals also sustained gunshot wounds.
There was a lot of confusion in the crowded area during the fight and after the gun was fired. The band quickly dispersed with many of the parade participants and onlookers, including defendant, August Vallery, and the two other individuals with whom they attended the parade, running and walking west on Government Street to an area near the railroad tracks. Subsequently, these individuals were driven back to Baton Rouge High School in a van owned by Linda Drury. After arriving at the high school, they got into the car in which they had traveled to the school earlier that day and were then dropped off at their respective homes. Defendant got out of the car at his father's house and at some point changed clothes. Later that afternoon, defendant went to his grandmother's house where several other family members had gathered, and it was subsequently decided to have defendant go to the police station to give a statement. Although defendant and his family waited many hours at the police station, defendant never gave his statement. Eventually, an attorney who had been called by defendant's family arrived and, shortly after midnight, defendant was arrested.

SUFFICIENCY OF THE EVIDENCE
In his sole assignment of error, defendant contends that the trial court erred in convicting him because there was insufficient evidence to establish beyond a reasonable doubt the essential element of identification of the perpetrator.
*888 The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the state proved every element of the crime and defendant's identity as the perpetrator of that crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); La.C.Cr.P. art. 821; State v. Thomas, 589 So.2d 555, 569 (La. App. 1st Cir.1991). Where, as here, the key issue is the defendant's identity as the perpetrator of the crime, rather than whether or not the crime was committed, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Long, 408 So.2d 1221, 1227 (La.1982).
In the highly charged atmosphere of the parade, the fight, the shooting and its aftermath, it is understandable that conflicting testimony was elicited from the many witnesses who testified at trial. Where there is conflicting testimony as to factual matters, credibility of witnesses is within the sound discretion of the trier of fact. State v. Richardson, 459 So.2d 31, 38 (La.App. 1 Cir.1984). An appellate court does not reweigh credibility of witnesses when reviewing sufficiency of the evidence. State v. Stowe, 93-2020 (La.4/11/94), 635 So.2d 168, 171. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law. See State v. Casey, 99-0023, p. 9 (La.1/26/00), 775 So.2d 1022, 1031, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000) (citing State v. Mussall, 523 So.2d 1305, 1310 (La.1988)).
Preliminarily, it should be noted that this incident occurred in the midst of a crowd. It was estimated by one witness that 80 to 100 people were in the area immediately surrounding the fight. The State presented eyewitness testimony of eight individuals and other witness testimony in support of its case against the defendant as the perpetrator of the crime. The defense presented five eyewitnesses and several other witnesses who testified that August Vallery was the one who fired the gun. During the trial, witnesses were questioned concerning the dates at which they came forward with their observations. Although many of the State's witnesses spoke with the police soon after the incident, many of the defense witnesses did not contact defense counsel or defendant's family until shortly prior to, or during, the trial.
All of the witnesses described August Vallery as a large, black man wearing an orange FUBU shirt with white lettering He carried a camera case by its shoulder straps during the parade. Several witnesses also noted that August Vallery carried a hair brush in his left hand. Defendant was described as being a thinner black man than August Vallery, with waves in his hair and wearing a plain orange Tommy Hilfiger knit shirt. These descriptions are corroborated by the photographs introduced into evidence.

The Fight
From the State's witnesses, information was presented that an argument between J.B. Carter and August Vallery had been ongoing for some time prior to the actual fistfight. Testimony of defense witnesses, Cleve Wilkins and Danielle Wilkinson, corroborated this fact. While walking along the right side of the band and continuing their argument, August Vallery and J.B. Carter came between two of the witnesses, Maurice Franklin and Takeecha Jones, *889 who were watching the parade from the north side of Government Street in front of a beige brick building located between 16th Street and the Entergy building. At this point, witness testimony placed defendant somewhere behind these two individuals.
J.B. Carter threw the first punch in the fight. During the fight, August Vallery faced toward the beige brick building while J.B. Carter faced away from the building. At some point, Charlie Myles, a friend of J.B. Carter, and defendant may have joined in the fight. Although testimony was introduced which identified defendant as a participant in the fight, conflicting testimony by defendant's mother and John Pierre Myer was also elicited.
The fight and subsequent shooting incident happened in front of Takeecha Jones and Maurice Franklin. The other State's witnesses who saw the fight were either participants in the fight or in close proximity to one of the participants. Of those defense witnesses who saw the fight, Clarence Green, Christopher Mackey, and John Pierre Myer testified that they never saw defendant during the fight, Chris O'Connor could not definitively say one way or the other, and two other defense witnesses, Cleve Wilkins and Danielle Wilkerson, testified to seeing defendant get hit during the fight and stumble backwards. Chris O'Connor testified that, although he did not see August Vallery get knocked to the ground, he did see him on the ground. None of the other witnesses testified to having seen August Vallery get up off the ground. Several witnesses testified as to seeing defendant get knocked down.

The Shooting
According to State eyewitness testimony, defendant was hit during the fight, which caused him to stumble backwards into the crowd. Tameeka Welsh, Rashika Dotson, Takeecha Jones, Maurice Franklin, Charlie Myles and Jermaine Johnson all testified that defendant (upon rising) had a gun in his hand and started shooting. All of these witnesses were standing within close proximity to the fight. August Vallery, who testified he did not see the person firing the gun, testified the bullets came from behind him. Eyewitness testimony placed defendant as being behind August Vallery immediately prior to the shooting. Sonya Robinson, a clarinetist who marched in the row immediately ahead of the fight, testified that she could plainly see August Vallery during the fight and shooting incident and he never had a gun in his hand.
Defense witnesses, Clarence Green, Chris O'Connor, Cleve Wilkins, Danielle Wilkinson, and John Pierre Myer, all testified that August Vallery was the person who shot the gun. Two of these witnesses, Clarence Green and Chris O'Connor, were watching the parade from the south side of Government Street near its intersection with 16th Street. Although Clarence Green testified that only three to four people were between him and the fight, Chris O'Connor, who viewed this incident from a similar vantage point, estimated 20 to 30 people were between him and the fight. This witness also testified as to observing August Vallery on and off for approximately 30 minutes prior to the fight. In contrast to these two defense witnesses, the other defense eyewitnesses were nearer to the fight: Cleve Wilkins testified he was three to five feet from the fight; Danielle Wilkerson was marching in the last row of clarinets on the left-hand side; and John Pierre Myer testified to have been within an arm's length from the fight. These three witnesses testified they saw August Vallery pull a gun from under his shirt and fire it. However, defense witness, Christopher Mackey, who testified *890 to have been standing six to eight feet from the fight, stated he saw August Vallery and J.B. Carter continue to fight after he heard the first gunshots and admitted that he did not see a gun in August Vallery's hands. Defendant testified on his own behalf and denied he killed J.B. Carter.
The gun used in this incident was never recovered by the police. Although testimony was consistent that the gun was a.38 or .357 revolver, which description was corroborated by forensic evidence, conflicting descriptions of the color of the gun was elicited from the various witnesses who testified at trial. Both Takeecha Jones and Maurice Franklin, witnesses who testified to seeing defendant shoot the gun, described the gun as a small, black steel revolver. Witnesses who identified August Vallery as the person who shot the gun, Clarence Green, Chris O'Connor, and John Pierre Myer, described the gun as being either chrome or a shiny or dull silver color. The State witnesses' description fits the description of the gun which Joseph Anderson, August Vallery, Dwayne Dunn, and Jermaine Johnson testified to having seen defendant previously carry on numerous occasions. August Vallery testified that the defendant frequently carried a gun when he went out, although he was unable to describe the length of the gun's barrel or identify its caliber. Defense testimony conflicted with these statements. Chris Mackey, a long-time friend of defendant, testified that he had never seen defendant with a gun, although he did admit that his friendship with defendant had lessened somewhat in the past year. Elizabeth Johnson, defendant's mother, also testified that she had never seen defendant with a gun.
J.B. Carter was hit by several bullets and fell to the ground, and three other individuals sustained gunshot wounds during the shooting. Two of the five gunshot wounds sustained by J.B. Carter were fatal according to Dr. Alfredo Suarez, the doctor who performed the autopsy. The trajectory of the bullet entering his left leg was from the back to the front, which indicated to Dr. Suarez that J.B. Carter had been shot by a weapon located behind and to the left of him. The fatal gunshot wound behind his left ear was from the back to the front and upward, which the doctor stated was more consistent with a gun being fired from someone knocked to the ground and coming up firing.

Events After the Incident
Tameeka Welsh, J.B. Carter's cousin, who had been walking with J.B. Carter prior to the fight, testified that although she and Rashika Dotson ran behind a building during the shooting, she ran to J.B. Carter immediately after he fell to the ground. From this position near J.B. Carter, she saw defendant momentarily lean over J.B. Carter and hit the bottom of the gun before he ran west on Government Street. According to this witness' trial testimony, this permitted her an opportunity to look closely at defendant, to see the waves in his hair and to be positive in her identification of him as the perpetrator of the crime.
The testimony of Rashika Dotson and Charlie Myles confirmed Tameeka Welsh's testimony regarding her return to J.B. Carter's side. Takeecha Jones testified, however, that she saw defendant run back into the crowd immediately after the shooting, and denied seeing defendant standing over J.B. Carter or anyone else near J.B. Carter until after the shooting had stopped.
Elizabeth Johnson, defendant's mother and a band parent who was walking alongside the band approximately 20 feet in front of where the fight took place, testified that she helped comfort Tameeka *891 Welsh after the shooting occurred and that Tameeka Welsh was mean and cursed those trying to help her. During this time, Tameeka Welsh told Elizabeth Johnson to "let her go so she could get that big black [] in that orange FUBU shirt."[1] Tameeka Welsh did not deny making that statement, but testified that what she meant by that statement was that the man wearing the orange FUBU shirt (i.e., August Vallery) was "one of them" and not that he was "the one."
Desmond Young, who played cymbals in the parade and whose position in the parade was eight to nine rows ahead of the first row of clarinets, testified at trial that he did not see the fight, but that he saw defendant running ahead of him while the last gun shots were being fired. Christopher Mackey, who was six to eight feet east of the fight location, testified that he also saw defendant running 50 feet ahead of him at about the same time as the last shot was fired. The trial testimony of both of these witnesses differed from their grand jury testimony. Desmond Young testified before the grand jury as to seeing portions of the fight, while Christopher Mackey admitted before the grand jury that he could have heard the last gunshot before seeing defendant running ahead of him.
The videotape admitted into evidence depicts the hundreds of people running down Government Street. It shows defendant running while looking over his shoulder and shows him to be ahead of August Vallery. August Vallery testified he was behind defendant because defendant is a faster runner and because he had to stop and walk some of the distance. While viewing the video, questioning was conducted concerning what was described as a "bulge" in defendant's front pocket, with the suggestion being made that it could be a gun. August Vallery testified that it did not look as if anything was in defendant's pocket, and defendant testified he did not remember what was in his pocket at the time, but that he usually carried money, "lip chop," and keys in his pockets.
Linda Drury, who is related by marriage to August Vallery's family, testified that she backed her van into the field on the north side of Government Street near its intersection with Eddie Robinson in order to watch the parade with her son and two grandsons. She testified she heard the gunshots and then saw all of the people running toward her on Government Street. August Vallery, defendant, Chris Mackey and two other boys (later identified to be Jermaine Johnson and Dwayne Dunn) came up to her. She could not remember which boy arrived at her van first, but she allowed all of them to get in the van. She believed the boys were wearing white teeshirts at the time. The boys sat in her van until the ambulance left and she was allowed to leave the area, at which time she took them back to Baton Rouge High School.
In contrast to this testimony (which placed August Vallery running toward the railroad tracks or sitting in the van subsequent to the shooting), defense witnesses, Shavone Anderson and Virginia Castle, both of whom were co-sponsors of the Capital High Pepsters (the group which marched last in the parade), testified. Shavone Anderson testified that approximately ten minutes after the shooting, August Vallery came up to them near the intersection of Government Street and 17th Street and was standing next to Virginia Castle. At that time, Virginia Castle testified that he came up about fifteen to twenty minutes after the shooting and said he had "popped" him, which *892 she believed meant he had shot J.B. Carter, and he threatened to "pop" anyone else who said they saw him do it. Defense witness, John Pierre Myer, also testified that August Vallery threatened him. This witness testified that August Vallery, after firing the gun, turned to him and threatened to shoot him if he said anything.
The record indicates the occupants of the van were located as follows: Linda Drury and her grandchildren sat in the front seat of the van, Christopher Mackey and Jermaine Johnson were in the middle seat, and defendant, August Vallery, and Dwayne Dunn sat in the backseat of the van. The various locations of the occupants may have been considered in assessing the conflicting testimony given relative to the conversation, if any, which may have occurred in the van. Linda Drury testified she did not hear any conversation between the boys in the backseat of her van. Dwayne Dunn testified defendant told him that "the guy hit him, that they started crowding him and that he had no choice, it was a reflex, to start shooting" and that "he hoped the lives would be spared." In his testimony at his first grand jury appearance, August Vallery denied having heard any conversation while in the van; whereas, in his second grand jury appearance and at trial, he testified as to hearing a similar confession from defendant and that he heard defendant say he had thrown the gun in the bushes.[2] Christopher Mackey, who testified he was very upset while sitting in the van due to his inability to locate his niece, initially testified that he was the only one talking in the van, that all of the conversation taking place in the van was directed to him to help him calm down, and that he would have heard anything said in the van. This witness subsequently admitted that it was "possible" that something might have been said between the backseat occupants of the van that he did not hear. Defendant denied that any whispered conversations took place in the van and specifically denied that he confessed to having shot J.B. Carter. He described the conversation in the van to have involved responses by the van occupants to questions asked by Mrs. Drury in order to try and make sense of what had happened, and trying to calm down Christopher Mackey.
Upon arriving at Baton Rouge High School, defendant, August Vallery, Jermaine Johnson and Dwayne Dunn got out of the van and into the car in which they had driven to the school earlier in the day. Defendant and Jermaine Johnson sat in the back seat, while August Vallery and Dwayne Dunn were in the front seat of the car. Jermaine Johnson, who testified he did not hear defendant say anything in the van, testified that in the car, defendant said "he hoped lives were spared," and that "he didn't mean to shoot but that it was something he had to do." Dwayne Dunn, who testified he heard defendant make such a statement in the van, testified he also heard defendant make a similar statement in the car. August Vallery testified he could not remember what comments were made in the car. Defendant denied making any such comments, and described the conversation in the car to be one of disbelief, such that everyone was wondering out loud as to how such a thing could have happened on Martin Luther King, Jr. Day.
Defendant returned to his father's house sometime between noon and 3:00 p.m. He changed his clothes and, at about 4:30 p.m., spoke to his mother on the telephone *893 and was thereafter picked up by his grandfather and taken to his grandmother's house. Defense witnesses testified that thereafter, defendant went to the police station with his mother, father and grandfather in order to give a statement to clear his name. Defendant testified that, although Detective Smith spoke to his parents soon after they arrived at the police station, no one spoke directly to him for quite some time. An attorney who was contacted by defendant's father later that night arrived at the police station by 11:00 or 11:30 p.m. The attorney advised defendant not to give his statement after having learned the police intended to arrest him.

Police Investigation
Police arrived at the scene of the shooting within minutes after it occurred and began their investigation. Detective Smith spoke with various witnesses, including Maurice Franklin, Takeecha Jones and Tameeka Welsh that afternoon, and reviewed the Channel 2 videotape. From viewing the videotape, the police noted a bulge in defendant's front pocket and a wave pattern in defendant's hair. A photo line-up was created and taken to where Tameeka Welsh was staying. She identified defendant from the photo line-up but, in doing so, commented that he looked darker in person.[3] A search warrant for the gun and orange shirt was executed at defendant's father's house; however, even though defendant's father directed them to the room in which his son was staying, neither item was located.[4] The police subsequently spoke with August Vallery, Dwayne Dunn and Jermaine Johnson, whose statements, according to the detective, "enhanced" the case against defendant. At trial, Detective Smith testified that as a result of the investigation, he "had no doubt in his mind" that defendant was the person who pulled the trigger and that August Vallery was not.
It was noted by the defense that no physical evidence tied defendant to the shooting inasmuch as the gun was not recovered and a gunshot residue test was not conducted. Pat Lane, a crime scene investigator, testified that the results of such tests are limited by time and that after the passage of six hours the test is never utilized. In addition, Elizabeth Johnson testified that she felt Detective Smith would treat defendant unfairly, given the detective's prior relationship with the Vallery family. Detective Smith denied any unfair treatment of defendant and stated he gave defendant every break he could. He admitted he had gone to school with one of August Vallery's aunts but that he was not close to them. He testified that he also knew defendant's family, having gone to school with some of defendant's uncles and an aunt.
After a thorough review of the record and our application of the appropriate standard of review which requires us to view the evidence in the light most favorable to the prosecution, we are convinced *894 any rational trier of fact could have concluded beyond a reasonable doubt that Brandon Johnson was the perpetrator of the crime for which he was convicted. The instant guilty verdict indicates that the jury accepted the testimony of the State's witnesses, which evidence was sufficient to negate any reasonable probability of misidentification. As the trier of fact, the jury is free to accept or reject, in whole or in part, the testimony of any witness. State v. Richardson, 459 So.2d 31, 38 (La. App. 1st Cir.1984). The jury's decision to accept the testimony of the State's witnesses was rational and therefore cannot be overturned by this court. See State v. Mussall, 523 So.2d at 1310. This assignment of error lacks merit.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] This quote contained profanities which we chose not to recite here.
[2] This witness stated that the only thing he did not tell the grand jury was what he heard defendant say in the van, and explained that he did not include this in his testimony during his first grand jury appearance because he was "trying to protect a friend."
[3] At trial, this witness explained that people frequently look brighter in photographs than in person.
[4] Although the police did not find the orange Tommy Hilfiger shirt when executing their search warrant the day of the incident, Alice Martin (defendant's grandmother) testified that she and her daughter picked up defendant's dirty clothes, which included the orange shirt, from his room at his father's house a few days later. She gave the shirt to defense counsel, and did not turn it in to the police because they never asked her for it. A shirt was introduced as evidence at the trial and viewed by the jury and questioning was had as to the cologne smell which could still be detected on the shirt and its creased fold lines. Defendant explained that a shirt would still smell of cologne after a year had passed if cologne had been sprayed on it before it was stored.